WO                    IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


CHRISTOPHER PATRICK BAILE,            )
                                     )
                    Plaintiff,        )
                                     )
            vs.                       )
                                     )
CAROLYN W. COLVIN, acting Commissioner )
of Social Security Administration,    )
                                     )          No. 3:13-cv-8223-HRH
                    Defendant.        )          (Prescott Division)
_____)


<u>O R D E R</u>

This is an action for judicial review of the denial of disability benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1381-1383f.  Plaintiff has timely filed his opening brief,[1] to which defendant has responded.[2]  Oral argument was not requested and is not deemed necessary.

<u>Procedural Background</u>

Plaintiff is Christopher Patrick Baile.  Defendant is Carolyn W. Colvin, acting Commissioner of Social Security.

---

[1]Docket No. 23.

[2]Docket No. 27.

On August 30, 2009, plaintiff filed an application for disability benefits under Title II of the Social Security Act and on August 24, 2009, he filed an application for supplemental security income under Title XVI.  In both applications, plaintiff alleged that he became disabled on October 17, 2008.  Plaintiff alleged that he was disabled because of mental illness.  Plaintiff's applications were denied initially and upon reconsideration.  After a hearing on April 11, 2012, an administrative law judge (ALJ) denied plaintiff's claims.  On July 17, 2013, the Appeals Council denied plaintiff's request for review, thereby making the ALJ's February 1, 2012 decision the final decision of the Commissioner.  On September 10, 2013, plaintiff commenced this action in which he asks the court to find that he is entitled to disability benefits.

## General Background

Plaintiff was born on October 25, 1974.  He was 37 years old at the time of the hearing.  Plaintiff has a high school education.  Plaintiff lives with his parents.  Plaintiff's past relevant work includes general labor and general factory work.

## The ALJ's Decision

The ALJ first determined that plaintiff met "the insured status requirements of the Social Security Act through December 31, 2013."[3]  The ALJ then applied the five-step

---

[3]Admin. Rec. at 29.

sequential analysis used to determine whether an individual is disabled.[4]

At step one, the ALJ found that plaintiff had "not engaged in substantial gainful activity since October 17, 2008, the alleged onset date...."[5]  At step two, the ALJ found that plaintiff had "the following severe impairments:   schizoaffective disorder not other specified (NOS), generalized anxiety disorder, and obsessive-compulsive disorder...."[6]

At step three, the ALJ found that plaintiff did "not have an impairment or

_____

[4]The five steps are as follows:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
> Step two: Is the claimant's alleged impairment sufficiently severe to limit ... h[is] ability to work? If so, proceed to step three.  If not, the claimant is not disabled.
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform ... h[is] past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow ... h[im] to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

[5]Admin. Rec. at 29.

[6]Admin. Rec. at 29.

combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1...."[7]  The ALJ specifically considered Listings 12.03 (schizophrenic, paranoid and other psychotic disorders) 12.04 (affective disorders) and 12.06 (anxiety-related disorders).[8]  The ALJ also considered whether plaintiff met the "paragraph B" criteria and concluded that he did not because he had only a mild degree of limitation in activities of daily living; mild to moderate difficulties in social functioning; moderate difficulties with concentration, persistence, or pace; and no episodes of decompensation.[9]

"Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC."  Bray v. Comm'r Soc. Sec. Admin., 554 F.3d 1219, 1222-23 (9th Cir. 2009). The ALJ found that plaintiff had "the residual functional capacity to perform the full range of work at all exertional levels but with the following nonexertional limitations.  He should be limited to simple, unskilled work, with no more than occasional interaction with co-workers and supervisors."[10]

The ALJ found plaintiff's symptom statements less than credible because they were

---

[7]Admin. Rec. at 30.

[8]Admin. Rec. at 30.

[9]Admin. Rec. at 30-31.

[10]Admin. Rec. at 31.

"not wholly consistent with the objective evidence", because the evidence indicated that his symptoms are well controlled with medication, and because plaintiff's GAF scores "have been substantially above what is consistent with a total disability to work."[11]

The ALJ gave great weight[12] to Dr. Lazorwitz's opinion.[13]  The ALJ gave substantial

---

[11]Admin. Rec. at 32-33.

[12]Admin. Rec. at 33.

[13]On January 22, 2010, Nicole Lazorwitz, Psy.D., opined that plaintiff

> is able to remember basic workplace locations and procedures[, and] able to remember and understand simple instructions. He appears to have a fair ability to remember more detailed instructions.  [He] is able to carry out simple instructions, follow simple work-like procedures, and make simple work-related decisions.  [He has] a fair ability to sustain attention throughout extended periods of time (up to 2 hours at a time). [He has] a fair ability to perform at consistent pace particularly if he is engaged in a simple, repetitive task.  [He has] an adequate ability to maintain a regular schedule.  [He] has a good to fair ability to interact appropriately with the general public, co-workers and supervisors.  [He] is able to maintain personal hygiene/standards of dress.  [He] has a fair ability to respond to basic work setting changes. He appears to have a good ability to take appropriate precautions in hazardous situations and utilize transportation.  [He] has a fair ability to organize himself and independently set goals.  [He] has the basic cognitive and emotional skills to perform simple, unskilled tasks in a competitive 40-hour work week environment on a sustained basis.

Admin. Rec. at 421.

weight[14] to Dr. Alarcio's opinion.[15]  The ALJ gave some weight[16] to the opinions of Dr. Gill[17]

---

[14]Admin. Rec. at 33.

[15]On December 12, 2009, Melanie Alarcio, M.D., examined plaintiff.  Plaintiff's physical examination was unremarkable, but Dr. Alarcio noted that he had a very flat affect.  Admin. Rec. at 409.  Dr. Alarcio's diagnoses were "[s]evere mental health issues, possibly bipolar disorder and obsessive-compulsive disorder."  Admin. Rec. at 409.  Dr. Alarcio opined that "there were no objective findings that would limit the claimant's capacity to stand, walk, sit, lift/carry, or do postural and manipulative activities.  However, because of his severe mental health issues, he will need constant supervision and guidance, and is likely disabled from this."  Admin. Rec. at 410.

[16]Admin. Rec. at 33.

[17]On January 13, 2010, Stephen C. Gill, Ph.D., who did a psychological evaluation of plaintiff, opined that plaintiff

> has the ability for the most part to understand short and simple instructions.  He does complain of trouble staying focused and concentrating and this was the problem at his last job.  The intrusive thinking appears to interfere with his ability to sustain focus and complete what he starts.  The patient has difficulty even carrying out simple and short instructions by his own report in accordance with what has been reported as part of the medical record.  The patient is able to have friends and has had friends for some time but appears to be withdrawing from them and is losing contact with them at this point in his life.  He is highly dependent upon his family.  His parents are his biological parents.  They have also been foster parents and by history the patient has had a number of foster brothers and sisters.  He gets along well with his mother and father and some members of his family but not others.  He was subject to physical abuse by his foster siblings when growing up.  The patient admits that he lacks motivation at the present time.  On the other hand, he is aware of normal hazards and takes appropriate precaution[s].  He is able to move about on his

(continued...)

and Dr. Koutrakos.[18]  The ALJ gave little weight[19] to Dr. Tilyou's opinion[20] and to the letter

_____

[17](...continued)
own but he is having difficulty setting realistic goals for himself.

Admin. Rec. at 416.

[18]On June 26, 2010, Stacy Koutrakos, Psy.D, opined that plaintiff "appears to have the ability to remember simple tasks[,]" "appears generally able to carry out simple instructions[,]" may experience "marked limitations ... in carrying out detailed instructions due to depressive and anxiety symptoms[,]" may experience "moderate limitations ... in [his] abilities to interact appropriately with supervisors and coworkers due to anxiety and a tendency to isolate[,]" and has "[f]air abilities ... to respond appropriately to work setting changes."  Admin. Rec. at 68-69.  Dr. Koutrakos opined that plaintiff would be "capable of sustaining simple unskilled work." Admin. Rec. at 69.

[19]Admin. Rec. at 34.

[20]On July 8, 2010, Dr. Tilyou opined that plaintiff had 1) no impairment as to his ability to carry out short and simple instructions; 2) no impairment as to his ability to be aware of normal hazards and take appropriate precautions; 3) mild impairment as to his ability to remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, and make simple work-related decisions; 4) mild impairment as to his ability to travel in unfamiliar places or use public transportation and set realistic goals or make plans independently of others; 5)  moderate impairment as to his ability to carry out detailed instructions and respond appropriately to changes in the work setting; 6) moderate to severe impairment as to his ability to accept instructions, respond appropriately to criticism from supervisors, and maintain concentration and attention for extended periods;  7) severe impairment as to his ability to sustain an ordinary routine without supervision, work in coordination with or proximity of others without being distracted by them, complete a normal work day and work week without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; and 8) severe impairment as to his ability to interact appropriately with the general public, ask simple questions or request assistance, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere

(continued...)

submitted by Richard Rogers.[21]

At step four, the ALJ found that plaintiff was "unable to perform any past relevant work...."[22]

At step five, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform...."[23]   This finding was based on section 204.00 of the Medical-Vocational Guidelines.[24]

The ALJ concluded that plaintiff had "not been under a disability, as defined in the Social Security Act, from October 17, 2008, through the date of this decision...."[25]

<u>Standard of Review</u>

Pursuant to 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of

---

[20](...continued)
to basic standards of neatness and cleanliness. Admin. Rec. at 451-453.  Dr. Tilyou noted that plaintiff's prognosis was unclear and that he expects possible improvement with medication adjustment but that plaintiff was "unable to work right now."  Admin. Rec. at 453.

[21]On June 17, 2010, Richard Rogers, the client services coordinator at the Guidance Clinic, noted that plaintiff was first determined to be Seriously Mentally Ill on 12/4/2003 and that he has continued to receive treatment since that date. Admin. Rec. at 455.

[22]Admin. Rec. at 34.

[23]Admin. Rec. at 34.

[24]Admin. Rec. at 35.

[25]Admin. Rec. at 35.

the Commissioner...."  The court "properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards."  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).  "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Id. (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  "'To determine whether substantial evidence supports the ALJ's decision, [the court] review[s] the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'"  Id.  If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the Commissioner's decision.  Id.  But, the Commissioner's decision cannot be affirmed "'simply by isolating a specific quantum of supporting evidence.'"  Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999)).

## Discussion

Plaintiff first argues that the ALJ erred in giving Dr. Tilyou's opinion little weight. Dr. Tilyou opined that plaintiff had 1) no impairment as to his ability to carry out short and simple instructions; 2) no impairment as to his ability to be aware of normal hazards and take appropriate precautions; 3) mild impairment as to his ability to remember locations and work-like procedures, understand and remember very short and simple instructions,

understand and remember detailed instructions, and make simple work-related decisions; 4) mild impairment as to his ability to travel in unfamiliar places or use public transportation and set realistic goals or make plans independently of others; 5) moderate impairment as to his ability to carry out detailed instructions and respond appropriately to changes in the work setting; 6) moderate to severe impairment as to his ability to accept instructions, respond appropriately to criticism from supervisors, and maintain concentration and attention for extended periods; 7) severe impairment as to his ability to sustain an ordinary routine without supervision, work in coordination with or proximity of others without being distracted by them, complete a normal work day and work week without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; and 8) severe impairment as to his ability to interact appropriately with the general public, ask simple questions or request assistance, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.[26]  Dr. Tilyou noted that plaintiff's prognosis was unclear and that he expected possible improvement with medication adjustment but that plaintiff was "unable to work right now."[27]

---

[26]Admin. Rec. at 451-453.

[27]Admin. Rec. at 453.

Dr. Tilyou was a treating source. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). "At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons." Id. (quoting Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)). "[I]f the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." Id. (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)). Here, the ALJ was required to give specific and legitimate reasons for rejecting Dr. Tilyou's opinion because it was contradicted by the opinions of other doctors.

The ALJ gave Dr. Tilyou's opinion little weight because his opinion that plaintiff

> would have "severe" restrictions in his ability to interact appropriately with members of the public, ask simple questions, get along with co-workers, and maintain socially appropriate behavior is inconsistent with his own treatment records, consistently reporting the claimant to have a GAF score in the rage of 61-68 from 2010 through 2011.[28]

The ALJ also gave Dr. Tilyou's opinion little weight because "his opinion on the statement that the claimant's current GAF was 58 is at odds with his treatment records from a mere

---

[28]Admin. Rec. at 34.

two days prior, reporting the claimant's GAF at 61...."[29]

These were not legitimate reasons for rejecting Dr. Tilyou's opinion because GAF scores do not necessarily relate to an individual's work capacities.[30]   A GAF score is the clinician's judgment of the individual's overall level of functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations.[31]   In other words, plaintiff's GAF scores were an assessment of how he was functioning in a treatment setting, but they have little relevance to how he might function in a work environment.  While the Ninth Circuit recently observed that "[a]lthough GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement," the court also noted "that GAF scores are typically assessed in controlled, clinical settings that may differ from work environments in important respects."  Garrison v. Colvin, 759 F.3d 995, 1003, n.4 (9th Cir. 2014).

---

[29]Admin. Rec. at 34.

[30]It is worth noting that "[t]he fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of 'its conceptual lack of clarity ... and questionable psychometrics in routine practice.'"  Williams v. Colvin, 757 F.3d 610, 613 (7th Cir. 2014) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013)).

[31]American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed. 2000).

Contrary to defendant's contention, the ALJ did not reject Dr. Tilyou's opinion because it was inconsistent with the other evidence in the record. The court can only "'judge the propriety of'" the ALJ's actions "'on the grounds invoked by the'" ALJ. Bray, 554 F.3d at 1226 (quoting Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999)). The only reason the ALJ gave for rejecting Dr. Tilyou's opinion was that some of the limitations that he found were inconsistent with the GAF scores that he assessed. This was error because the ALJ "used unqualified data [GAF scores], provided by the professional as a macroscopic evaluation, to disprove the professional's more detailed, expert functional assessment." Smith v. Astrue, 565 F. Supp. 2d 918, 925 (M.D. Tenn. 2008).

Plaintiff next argues that the ALJ erred in giving Dr. Gill's opinion only "some" weight. Dr. Gill opined that plaintiff

> has the ability for the most part to understand short and simple instructions. He does complain of trouble staying focused and concentrating and this was the problem at his last job. The intrusive thinking appears to interfere with his ability to sustain focus and complete what he starts. The patient has difficulty even carrying out simple and short instructions by his own report in accordance with what has been reported as part of the medical record. The patient is able to have friends and has had friends for some time but appears to be withdrawing from them and is losing contact with them at this point in his life. He is highly dependent upon his family. His parents are his biological parents. They have also been foster parents and by history the patient has had a number of foster brothers and sisters. He gets along well with his mother and father and some members of his family but not others. He was subject to physical abuse by his foster siblings when growing up. The

> patient admits that he lacks motivation at the present time. On the other hand, he is aware of normal hazards and takes appropriate precaution[s]. He is able to move about on his own but he is having difficulty setting realistic goals for himself.[32]

Dr. Gill was an examining source. "The opinion of an examining doctor, even if contradicted by the opinion of another [nonexamining] doctor, can only be rejected for specific and legitimate reasons that are supported by the record." Lester, 81 F.3d at 830-31. The ALJ gave Dr. Gill's opinion "some" weight but rejected Dr. Gill's opinion that plaintiff would have difficulty carrying out even short and simple instructions because it was inconsistent with Dr. Gill's observation that plaintiff was reported to have a GAF of 70 by his treating doctor.[33]

The ALJ erred in rejecting a portion of Dr. Gill's opinion. The ALJ primarily rejected a portion of Dr. Gill's opinion based on plaintiff's GAF scores, which as discussed above, are not a legitimate reason for rejecting a doctor's opinion. To the extent the ALJ justified his rejection of a portion of Dr. Gill's opinion by giving great weight to Dr. Lazorwitz's opinion,[34] Dr. Lazorwitz's opinion "cannot by itself constitute substantial evidence that

---

[32]Admin. Rec. at 416.

[33]Admin. Rec. at 33.

[34]Dr. Lazorwitz opined that plaintiff "is able to remember basic workplace locations and procedures[, and] able to remember and understand simple instructions. He appears to have a fair ability to remember more detailed instructions. [He] is able to carry out
(continued...)

justifies the rejection of the opinion of either an examining physician or a treating physician."  Lester, 81 F.3d at 831.

Plaintiff next argues that the ALJ erred in finding that plaintiff could perform "unskilled work" because a finding that a claimant can perform "unskilled work" is an insufficient substitute for determining a claimant's mental residual functional capacity.  SSR 85-15 states that "[t]he decisionmaker must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work.  The decision requires careful consideration of the assessment of RFC."  Plaintiff argues that the ALJ was required to make a function-by-function assessment, which would include functions such as "understanding, remembering, and carrying out instructions" and "responding appropriately to supervision, coworkers, and work pressures...." 20 C.F.R. 404.1545(c).  By limiting him to "unskilled work with no more than occasional interaction with co-workers and supervisors", plaintiff argues that the ALJ failed to consider other functional

---

[34](...continued)

simple instructions, follow simple work-like procedures, and make simple work-related decisions.  [He has] a fair ability to sustain attention throughout extended periods of time (up to 2 hours at a time).  [He has] a fair ability to perform at consistent pace particularly if he is engaged in a simple, repetitive task.  [He has] an adequate ability to maintain a regular schedule.  [He] has a good to fair ability to interact appropriately with the general public, co-workers, and supervisors.  [He] is able to maintain personal hygiene/standards of dress.  [He] has a fair ability to respond to basic work setting changes. He appears to have a good ability to take appropriate precautions in hazardous situations and utilize transportation.  [He has] a fair ability to organize himself and independently set goals. [He] has the basic cognitive and emotional skills to perform simple, unskilled tasks in a competitive 40-hour work seek environment on a sustained basis."  Admin. Rec. at 421.

limitations.  In short, plaintiff argues that the ALJ failed to make a function-by-function assessment of his residual functional capacity.

The regulations define "unskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  Social Security rulings further define "unskilled work" as requiring the ability to "[u]nderstand[], remember[], and carry[] out simple instructions," to "mak[e] ... simple work- related decisions[,]" to '[r]espond[] appropriately to supervision, co- workers and usual work situations" and to "[d]eal with changes in a routine work setting."  SSR 96-9p. A finding that plaintiff was limited to "unskilled work" necessarily encompasses these limitations.  Thus, the ALJ did not fail to make a function-by-function assessment.

Plaintiff next argues that the ALJ erred in relying on the Medical-Vocational guidelines at step five.  "At step five, the ALJ can call upon a vocational expert to testify as to: (1) what jobs the claimant, given his or her residual functional capacity, would be able to do; and (2) the availability of such jobs in the national economy."  Tackett, 180 F.3d at 1101.  But, "[i]n some cases, it is appropriate for the ALJ to rely on the Medical–Vocational Guidelines to determine whether a claimant can perform some work that exists in 'significant numbers' in the national economy.  The Medical–Vocational Guidelines are a matrix system for handling claims that involve substantially uniform levels of impairment." Id.  Here, the ALJ used the Medical-Vocational Guidelines to determine that "there are jobs

that exist in significant numbers in the national economy that [plaintiff could] perform....["][35]

The ALJ found that plaintiff had no exertional limitations and that his only limitations were non-exertional. "Where a claimant suffers only non-exertional limitations, the grids are inappropriate, and the ALJ must rely on other evidence." Lounsbury v. Barnhart, 468 F.3d 1111, 1115 (9th Cir. 2006). Thus, it was error for the ALJ to rely on the Medical-Vocational Guidelines at step five.

Finally, plaintiff argues that the ALJ erred in finding his symptom statements not "wholly credible...."[36] "An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." Garrison, 759 F.3d at 1014. "'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). "In this analysis, the claimant is not required to show 'that h[is] impairment could reasonably be expected to cause the severity of the symptom []he has alleged; []he need only show that it could reasonably have caused some degree of the symptom.'" Id. (quoting Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996)). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the

---

[35]Admin. Rec. at 34.

[36]Admin. Rec. at 32.

severity thereof.'" Id. (quoting Smolen, 80 F.3d at 1281). "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" Id. at 1014-15 (quoting Smolen, 80 F.3d at 1281). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" Id. at 1015 (quoting Moore v. Comm'r of Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)). "In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Turner v. Comm'r of Social Sec., 613 F.3d 1217, 1224 n.3 (9th Cir. 2010)). "For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.]" Id. (internal citations omitted).

Despite plaintiff's contention to the contrary, the ALJ did not give just one reason for finding plaintiff's symptom statements less than credible. Rather, the ALJ found plaintiff's symptom statements less than credible because they were "not wholly consistent with the objective evidence", because the evidence indicates that his symptoms are well controlled with medication, and because plaintiff's GAF scores "have been substantially

above what is consistent with a total disability to work."[37]

As for the first reason, the ALJ gave three examples of plaintiff's testimony not being consistent with the objective evidence. First, the ALJ stated that "[c]ontrary to [plaintiff's] testimony of being unable to maintain attention and focus, psychiatric progress notes reported him as 'goal-oriented regarding his treatment' with the help of his psychotropic medications...."[38] Second, the ALJ noted that "[r]ecords from July 14, 2011 also reported that [plaintiff] likes and plays games on the computer, a fact that he denied at the hearing...."[39] Thirdly, the ALJ stated that "[i]n contrast to [plaintiff's] testimony of social isolation, and fear of embarrassing himself in public, the same treatment notes from July 2011 report that [plaintiff] has 'lots of support from his family,' and that he has 'supportive friends.'"[40]

This was not a clear and convincing reason to find plaintiff's symptom statements less than credible. As for plaintiff being goal-oriented regarding his treatment, the fact that plaintiff wanted to get better does not mean that he was better. As for his use of the

---

[37]Admin. Rec. at 32-33.

[38]Admin. Rec. at 32.

[39]Admin. Rec. at 32.

[40]Admin. Rec. at 32.

computer, the ALJ asked plaintiff if he "played computer games."[41]  There was a reference
in a July 2011 treatment plan that one of plaintiff's strengths was that he "play[s] games on
computers"[42] but in his function reports what plaintiff reported doing was spending time
on the computer and his dad stated that plaintiff "plays" on the computer,[43] both which
might mean something other than playing computer games.  As for the last example, one
reference in a treatment plan to having "supportive friends" does not mean that plaintiff's
reports of isolation were exaggerated.

As for the second reason given by the ALJ, that plaintiff's symptoms are well
controlled by medication, the evidence in the record does not bear this out.  Plaintiff's
treating psychiatrists were continually adjusting his meds, trying to find a combination that
would allow plaintiff to function.[44]  In addition, there is very little evidence in the record

_____

[41]Admin. Rec. at 53.

[42]Admin. Rec. at 466.

[43]Admin. Rec. at 189, 193, 201, & 231.

[44]Admin. Rec. at 301 (on October 7, 2008, the plan was to continue plaintiff's current
medications and do a trial of Strattera 40 for ADHD); Admin. Rec. at 298 (on February 24,
2009, Strattera was discontinued); Admin. Rec. at 262 (on September 8, 2009, the plan was
to "[d]iscontinue Zoloft.  Titration onto Luvox up to 200 mg daily for OCD/mood");
Admin. Rec. at 259 (on November 17, 2009, the plan was to "[t]itrate up to 150 mg bid of
Luvox for OCD" and continue other meds); Admin. Rec. at 256 (on February 23, 2010, the
plan was to "[t]aper off Abilify and back onto Risperdal up to 3 mg nightly for mood
symptoms/OCD.  Continue other medications"); Admin. Rec. at 251 (on April 20, 2010, the
plan was to do a "[t]rial of Zyprexa 10 mg nightly for self-injury and possible psychosis.
(continued...)

that plaintiff's talking out loud improved or changed much over time.[45]  This was not a

_____

[44](...continued)
Continue other medications"); Admin. Rec. at 248 (on May 11, 2010, the plan was to decrease Strattera, increase Zyprexa, add Lamictal, and continue with other medications); Admin. Rec. at 495 (on July 6, 2010, Dr. Tilyou noted a "[s]light improvement resuming Lamictal and decreasing Strattera.  Again, multiple med changes since 1/08 with unclear responses, but better on that regimen, perhaps especially with Lamictal; perhaps increased OCD with Strattera.  Perhaps Cymbalta, or other antidepressant better than Luvox, and Klonopin may be indicated.");  Admin. Rec. at 491 (on October 12, 2010, the plan was to "[d]ecrease Zyprexa to 15 mg nightly and add Abilify 5 mg nightly, and continue other meds as prescribed.");  Admin. Rec. at 484 (on December 9, 2010, Dr. Tilyou noted a "[p]ossible improvement with med changes" and the plan was to decrease Zyprexa to 7.5 mg nightly and increase Abilify to 10 mg nightly and continue other meds as prescribed); Admin. Rec. at 476 (on March 23, 2011, the plan was to "stop Zyprexa and increase Abilify to 20 mg nightly.  Add Restoril 15 mg nightly for disrupted sleep cycle.  Continue other meds as prescribed"); Admin. Rec. at 462 (on August 11, 2011, the plan was to increase Zoloft to 300 mg night, to see an ophthalmologist for the blurred vision since no difference off Zyprexa, and to consider Klonopin, lurasidone).

[45]Admin. Rec. at 303 (on August 12, 2008, plaintiff reported that he was talking about things out loud); Admin. Rec. at 300 (on October 7, 2008, plaintiff reported that he is still talking out loud all the time);  Admin. Rec. at 294 (on May 26, 2009, plaintiff "continue[d] to complain of 'talking out loud about thoughts that are running through my head'"; Admin. Rec. at 261-62 (on September 8, 2009, Dr. Vaughan noted that plaintiff "and his father report that he goes through scenarios where he pretends like his life is different than it is, and he acts out scenarios and talks to himself");  Admin. Rec. at 258 (on November 17, 2009, plaintiff "report[ed] significant improvement in 'day dreaming' and talking to himself since starting on Luvox");  Admin. Rec. at 255 (on February 23, 2010, plaintiff reported that he "continues to have scenarios he plays out in his head where he knows that he is not in reality and is yelling at his brother or daydreaming[.]  'I'd rather live in my head than in real life'"); Admin. Rec. at 250 (on April 20, 2010, plaintiff "still report[ed] active daydreams where he feels he is in an 'alternate reality'"); Admin. Rec. at 494 (on July 6, 2010, plaintiff reported that "[t]alking out loud is 'the same,' less yelling"); Admin. Rec. at 490 (on October 12, 2010, plaintiff reported that he was "[d]oing the same - not banging head too often, still pacing and talking to myself,' (when angry)"); Admin. Rec. at 483 (on December 9, 2010, plaintiff reported that  "[t]alking out loud (is the same)"; Admin. Rec. at 475 (on

(continued...)

-21-

clear and convincing reason for finding plaintiff's symptom statements less than credible.

As for plaintiff's GAF scores, GAF scores might have some relevancy to the question of whether a claimant is exaggerating his symptoms. Thus, the fact that plaintiff had GAF scores that indicated moderate to mild problems with functioning might indicate that plaintiff was exaggerating his symptoms. But, because GAF scores are a reflection of how a person is functioning in a treatment setting as opposed to a work environment and given the fact that GAF scores have been abandoned because of their lack of clarity, this is not a clear and convincing reason by itself to find plaintiff's symptom statements less than credible.

Because the ALJ erred as to Dr. Tilyou's and Dr. Gill's opinions, in relying on the Medical-Vocational guidelines at step five, and in finding plaintiff's symptom statements less than credible, the court must decide whether to remand this case for benefits or for further proceedings. Plaintiff argues that the "credit-as-true" rule applies here and thus a remand for an award of benefits is appropriate. "[I]n order for a court to remand to an ALJ with instructions to calculate and award benefits," the following three parts of the

---

[45](...continued)
March 23, 2011, plaintiff reported that he is "[a]ngry 'only sometimes when talking to myself,' but chronic 'talking to myself'"); Admin. Rec. at 469 (on May 19, 2011, plaintiff reported that "[i]ncreased Abilify helps [him] feel 'a little better, out of bed and room a little more, not yelling, but talking to myself'"); Admin. Rec. at 461 (on August 11, 2011, plaintiff reported that "'[a]t first, felt better, just all around,' with change to Zoloft – 'not talking to self as much' and 'sleeping a little better' but now worn off").

"credit-as-true" rule must be satisfied:

> (1) the record has been fully developed and further adminis-
> trative proceedings would serve no useful purpose; (2) the ALJ
> has failed to provide legally sufficient reasons for rejecting
> evidence, whether claimant testimony or medical opinion; and
> (3) if the improperly discredited evidence were credited as
> true, the ALJ would be required to find the claimant disabled
> on remand.

Garrison, 759 F.3d at 1020.

In this case, the record is not fully developed.  If Dr. Tilyou's and Dr. Gill's opinions were credited as true, there is no evidence in the record that someone with the limitations found by these doctors could not perform any work.  Similarly, if plaintiff's testimony is credited as true, there is no evidence in the record that someone with the symptoms that plaintiff describes would be precluded from performing all work.   Thus, a remand for further proceedings is required.

<u>Conclusion</u>

Based on the foregoing, the Commissioner's decision is reversed and this matter is remanded for further proceedings.

DATED at Anchorage, Alaska, this 1st day of December, 2014.

/s/ H. Russel Holland
United States District Judge
